**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION**

**LAURA LASCOLA, Individually and as
Sole Heir and Next of Kin to NORMA
DALE MASSA, Deceased,**                                          **PLAINTIFF,**

**VS.**                                          **CIVIL ACTION NO. 2:06CV080-P-A**

**BARDEN MISSISSIPPI GAMING, LLC
d/b/a Fitzgerald's Casino Hotel-Tunica;
TUNICA COUNTY MISSISSIPPI; K.C.
HAMP, Sheriff of Tunica County, in His
Official Capacity; KATIE JOHNSON,
Tunica County Sheriff's Deputy, in Her
Official Capacity; and JANE DOE,
Unknown Tunica County Sheriff's
Deputy, in Her Official Capacity,**                                          **DEFENDANTS.**

## MEMORANDUM OPINION

These matters come before the court upon Defendants Tunica County, Mississippi and

Tunica County Sheriff's Department's Motion for Summary Judgment [445], Defendant Barden

Mississippi Gaming, LLC's Motion for Summary Judgment [453], and the plaintiff's Motion for

Partial Summary Judgment [455]. After due consideration of the motions and the responses filed

thereto, the court is prepared to rule.

### I. FACTUAL BACKGROUND[1]

The instant case involves the disappearance of the plaintiff's mother, Norma Massa, on or

about December 13, 2004 from Fitzgerald's Casino in Tunica, Mississippi and the finding of Ms.

---

[1] The facts have been drawn heavily from the Complaint and presented in a light most
favorable to the plaintiff.

1

Massa's body by a hunter approximately a year later in the woods some two miles away from Fitzgerald's on January 1, 2006.

On December 13, 2004 Ms. Massa accompanied seventeen other residents from St. Peter Manor in Memphis on a bus operated by St. Peter Manor to Fitzgerald's casino. St. Peter Manor is an assisted-living facility wherein Ms. Massa – sixty-one years old – lived in her own apartment and was free to leave at any time. Ms. Massa suffered from a form of dementia, though the extent of that illness is disputed. Ms. Massa and her neighbors arrived at the casino at or around 11:00 a.m. As would be shown by video surveillance later, Ms. Massa left the casino at 12:26 p.m. alone and walked out to the casino's rear parking lot. At or around 12:59 p.m., the video shows that Ms. Massa walked down the driveway toward the Tunica River Park Museum and thereafter disappeared from the video.

The St. Peter Manor bus returned to the casino at 3:30 p.m. After being unable to locate Ms. Massa, the bus driver asked the casino to page her. When she did not return after fifteen minutes, the bus left with the other residents at or about 3:45 p.m. Approximately one hour later, St. Peter Manor notified Ms. Massa's daughter, Laura Lascola, that her mother failed to board the bus whereupon Ms. Lascola drove from Memphis down to the casino. During the drive, Ms. Lascola avers that she called the casino's security department and alerted them that her mother was missing and that she was disabled. Ms. Lascola also states that she called the Tunica County Sheriff's Department and informed them that her mother was disabled by dementia, that she wandered off from the casino,  and that she had wandered away before in September 2004 from the Mid-South Fair and was found seven hours later approximately seven miles from the fairgrounds. Ms. Lascola arrived at the casino at or around 5:30 p.m. whereupon she met with Deputy Sheriff Katie Johnson

and reiterated that her mother was disabled and had wandered away before. Ms. Lascola avers that Deputy Johnson informed her that because Ms. Massa was an adult, it was the Sheriff's Department's policy not to conduct searches until at least 24 hours have elapsed.

Fitzgerald's employees and members of the sheriff's department searched the immediate grounds for Ms. Massa. However, a full search with dogs was not conducted by the Sheriff's Department until around 1:00 pm the next day. Ms. Massa was not located. The Sheriff's Department conducted another search on December 18, 2004 but was unable to locate Ms. Massa once again.

Meanwhile, Ms. Lascola hired two investigative services, prepared flyers, established a web sit, met with the media, and traveled throughout the immediate region seeking clues. Ms. Lascola also avers that she requested all relevant documentary evidence from Fitzgerald's and the Sheriff's Department, but such requests were denied.

More specifically, on July 11, 2005 Ms. Lascola requested the following information from Fitzgerald's: (1) their investigative file; (2) all surveillance videos of the parking lot on December 13, 2004 between 12:00 pm and 3:30 pm; (3) all documents relating to Ms. Massa's disappearance; (4) a complete list of all guests, their addresses and phone numbers who were at the casino on December 13, 2004; (5) info on all people using their player's card on December 13, 2004between 11:30 am and 3:30 pm; and (6) a list of all employees working between 11:30 am and 3:30 pm. In response to the request, the plaintiff maintains that the casino only provided her copies of some surveillance tapes, the operative tape having an 11-second glitch which was later determined by a court-appointed expert to have been erased, though the expert concluded that he could not say that the tape had been deliberately tampered with.

Also on July 11, 2005, Ms. Lascola requested the following documents from the Tunica County Sheriff's Department: (1) the investigative file; (2) all surveillance videos in their possession; (3) all documents relating to Norma's disappearance; and (4) the names of all witnesses interviewed and what was done after the interviews. According to the plaintiff, the Sheriff's Department only sent the plaintiff a one-page document entitled: "Offense/Incident Report."

On or about November 14, 2005 the plaintiff requested that K.C. Hamp, the Sheriff of Tunica County, provide: (1) a copy of the Policy and Procedures Manual regarding TCSD's procedure for investigating reported missing persons; (2) a copy of the complete file of Norma's case; (3) all reported criminal incidents at Fitzgerald's and its surrounding area for 2002-2004; and (4) personnel and training files of all deputies involved in this case. The plaintiff avers that she received no response.

On December 12, 2005 the plaintiff notified Tunica County of a claim against them pursuant to section 11-46-9 of the Mississippi Tort Claims Act.

On January 17, 2006 the plaintiff avers that she once again requested the information from Tunica County. Some time thereafter, Tunica County sent the plaintiff approximately 300 pages of information, the majority of which the plaintiff argues did not conform to her requests and were duplicative in nature.

On January 1, 2006 a hunter found the remains of who turned out to be Norma Massa in the woods approximately two miles from Fitzgerald's Casino. The plaintiff maintains that shortly after her mother's remains were discovered, Tunica County Sheriff's Department Deputy Randy Stewart told the plaintiff she could witness the site where her mother's remains were found. When she drove there, an unknown female deputy told her she could not go to the site and said that if she did, she

"would be in serious trouble" and after telling her she had received permission from Stewart, the female deputy told her to "call her lawyer."

On or about January 12, 2006 dental records confirmed the remains were those of Ms. Massa. Though the autopsy was unable to determine the cause of death, the Provisional Report of Autopsy indicated that the death was "unusual/suspicious" – while not checking the box for "violent or unnatural death."

On January 24, 2006, almost three weeks after Ms. Massa's body was found, the plaintiff settled a Tennessee lawsuit alleging negligence, gross negligence, and breach of contract against St. Peter Manor filed on June 13, 2005 for $650,000.00.

Another salient fact is that the plaintiff testified in her deposition, along with Ms. Lynn Nelson, that she believed that her mother left a telephone message on her answering machine several days after December 13, 2004. Furthermore, it is undisputed that during the searches conducted with dogs, the dogs indicated that Ms. Massa had walked to other nearby casinos. What is more, the Sheriff's Department received information that Ms. Massa may have been at the Oak Court Mall in Memphis where the dogs later indicated that she had in fact been there.

On May 4, 2006 Laura Lascola, individually and as the sole heir and next of kin to Norma Massa, filed the instant lawsuit against Barden Mississippi Gaming, LLC d/b/a Fitzgerald's Casino Hotel-Tunica; and Tunica County, Mississippi via Tunica County Sheriff K.C. Hamp and Deputy Sheriff Katie Johnson, in their official capacities.[2]

---

[2] In her Complaint, the plaintiff also named K.C. Hamp and Katie Johnson in their individual capacities. However, the plaintiff's claims against them in their individual capacities were dismissed on June 13, 2007. Furthermore, the plaintiff originally named Tunica County Sheriff's Department as a defendant; however, through her briefs, she has conceded that Tunica County Sheriff's Department is not a proper party because it is not a separate governmental entity, rather, Tunica

Against the casino, the plaintiff levies claims of negligence and gross negligence, arguing that since Norma Massa was a business invitee, the casino "had an affirmative duty to come to her aid when they knew or should have known that she was in distress and was in need medical assistance," and they "violated the duty of care ... by negligently failing to take reasonable, affirmative steps to render minimal, necessary assistance to avoid her wandering away from the casino in a confused and disoriented stated." The plaintiff alleges that the casino is liable for negligent supervision because the casino markets to seniors at nursing and retirement homes, and thereby created constructive notice that casino employees should have been trained "to recognize when a person was in distress and in need of medical assistance, or otherwise incapacitated or disabled." The plaintiff also asserts a claim against the casino for intentional infliction of emotional distress because she alleges that they "knowingly, intentionally, and recklessly" obstructed and impeded the plaintiff's efforts to find her mother by refusing to provide all of the information the plaintiff requested which was "so outrageous in character and so extreme in degree to go beyond all possible bounds of civilized decency."

Against Tunica County, Mississippi, the plaintiff levies the following claims: (1) reckless disregard pursuant to Miss. Code Ann. § 11-46-9(1)(c) due to Deputy Johnson's failure to initiate an immediate full-scale search, knowing that Ms. Massa was disabled and had wandered away before, citing a 24-hour search policy for adults; (2) three claims under 42 U.S.C. § 1983 – that is, (a) an Equal Protection claim since the Tunica County Sheriff's Department had a policy of

---

County, Mississippi is the proper defendant in this regard. Finally, the plaintiff also named as a defendant Jane Doe, an unknown Tunica County Sheriff's Deputy, but throughout the history of this case, the identity of the Jane Doe defendant has not been named. In any event, the court considers Tunica County to be responsible for the plaintiff's claims against Jane Doe.

affording less protective services to disabled adults than to other groups of missing persons, particularly children, given the 24-hour search rule; (b) a Substantive Due Process - State Created Danger claim, arguing that Tunica County created or enhanced the danger to Ms. Massa by responding to the missing person report but not conducting a full search until 1:00 p.m. on the next day despite knowing Ms. Massa was disabled, she had wandered away before, and the temperature was in the 30s; (c) a Substantive Due Process - Deprivation of Life claim, arguing that Tunica County deprived Ms. Massa of her right to life by establishing a policy of not searching for disabled adults within the first 24 hour; and (3) a claim for intentional infliction of emotional distress for (a) intentionally obstructing the plaintiff's efforts to find her mother by refusing access to public records; and (b) by not allowing the plaintiff to view the site where her mother was found.

The casino and Tunica County have filed motions for summary judgment, seeking dismissal of all of the plaintiff's claims. The plaintiff has also filed a motion for partial summary judgment arguing that she is entitled to a judgment as a matter of law on her claims against Tunica County given the lack of knowledge and cooperation by Tunica County's Rule 30(b)(6) witness, Lt. Sheila McKay.

## II. DISCUSSION

### A. Summary Judgment Standards

Summary judgment should be entered only if "[t]here is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment has the initial burden of demonstrating through the evidentiary materials that there is no actual dispute as to any material fact in the case. *Celotex Corp. v. Catrett*, 477 U.S. 3l7, 323 (l986). On motion for summary judgment, "[t]he inquiry performed is the

threshold inquiry of determining whether there is a need for a trial -- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (l986). In determining whether this burden has been met, the court should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id*. Furthermore, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The summary judgment procedure does not authorize trial by affidavit. Rather, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson*, 477 U.S. at 255. Accordingly, a court may not decide any factual issues found in the record on motion for summary judgment, but if such material issues are present, the court must deny the motion and proceed to trial. *Impossible Elec. Tech. v. Wackenhut Protection Systems*, 669 F.2d l026, l03l (5th Cir. l982); *Environmental Defense Fund v. Marsh*, 65l F.2d 983, 99l (5th Cir. l98l); *Lighting Fixture & Electric Supply Co. v. Continental Ins. Co.*, 420 F.2d l2ll, l2l3 (5th Cir. l969).

Summary judgment is not proper if a dispute about a material fact is "genuine," or in other words the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. There is no such issue unless the evidence sufficiently supports the non-moving party's version of the facts for a jury to return a verdict in the non-moving party's favor. *Id*.

at 249. The relevant inquiry is whether or not there is sufficient disagreement on the facts to submit them to the jury or whether it is so one-sided that one party should prevail as a matter of law. *Id*. at 251. The issue must be genuine, and not pretended, and the evidence relied on to create such an issue must be substantial. *Southern Distributing Co. v. Southdown, Inc.*, 574 F.2d 824, 826 (5th Cir. 1978).

**B. The Plaintiff's Claims Against Tunica County**

**1. § 1983 Claims**

In her response brief to Tunica County's thorough argument against the plaintiff's § 1983 claims, the plaintiff stated: "Plaintiff does not present any argument regarding her Section 1983 claims and relies upon the factual allegations contained in the complaint to dispute Defendants' allegations." However, under the provisions of Federal Rule of Civil Procedure 56(e), a party against whom a motion for summary judgment is made may not merely rest upon his pleadings, but must, by affidavit, or other materials as provided in Rule 56, inform the court of specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

The court concludes that the plaintiff's efforts in rebutting Tunica County's summary judgment arguments regarding the § 1983 claims do not conform to the standards of Rule 56(e). Accordingly, for this reason alone, summary judgment on the plaintiff's § 1983 claims should be granted.

In addition to her failure to articulate reasons why there are genuine issues of material facts warranting denial of summary judgment on the § 1983 claims, the plaintiff has not contested that Tunica County's written policy regarding searches provided in pertinent part:

**Policy**:
Officers investigating reports of missing persons must conduct proper investigations;

prepare necessary reports; and request statewide or National Crime Information entries.
***

**Missing Persons – Receiving a Telephone Call**:
Officers receiving a missing persons notification utilizes [sic] the following procedure:

    1. Interview the reporting person and evaluate the information received.

        a. If the information fits the following criteria [one or a combination of items may surface in the discretion of the officer] for a missing person, complete an *initial missing persons report*. The criteria is [sic]:

            ***

        v. Person is physical [sic] or mentally disabled or is senile

***

**Missing Person Entries:**
A missing person record may be entered into the statewide or NCIC for a person of any age for the following reasons:

    1. Missing person is under proven physical/mental disability or is senile, thereby possibly subjecting self or others to personal and immediate danger.

***

**Wilderness Searches:**

When circumstances indicate that the missing person may be "lost," or located in a remote area and is injured or disoriented, the primary investigator, with approval of the Sheriff, may initiate a search efforts. The department will serve as the lead agency in the search, and will ask from [sic] support from fire, EMS and perhaps volunteer agencies as needed, depending upon the size of the search area and difficulty of terrain.

Exhibit E to Tunica County's Motion for Summary Judgment.

Thus, although the plaintiff avers that Deputy Johnson told her that Tunica County's policy was not to conduct a full search until after 24 hours when the missing person was an adult, she does not dispute that the official policy indicated otherwise. In fact, the plaintiff writes in her response brief to Tunica County's motion for summary judgment: "Deputy Johnson and the Tunica County

Sheriff's Department (TCSD) violated Tunica County's own policy regarding missing persons and refused to initiate a full-scale search. A full-scale search should have been implemented immediately according to the applicable policies and procedures then and there existing, because Ms. Massa was mentally disabled. Tunica County Sheriff's Department's own policy recognizes that there is a greater risk to adults with mental disabilities, like Ms. Massa than those adults without mental disabilities." Response Brief at 6.

The plaintiff's admission that Tunica County in fact had a written policy that provided for immediate searches for disabled adults speaks against her § 1983 claims asserted in her Complaint. First, the Substantive Due Process -Deprivation of Life claim and the Equal Protection claim both rest on the primary assertion that Tunica County had a policy of not searching for disabled adults before the passing of 24 hours. Second, all three of the § 1983 claims require proof not only that a constitutional violation occurred, but also that the violation occurred pursuant to a policy of the governmental entity. *Monell v. New York City Dept. of Soc. Services*, 436 U.S. 658, 691 (1978); *Williams v. Kaufman County*, 352 F.3d 994, 1013 (5th Cir. 2003). Furthermore, the plaintiff must also show that there was a "direct causal link" between Tunica County's policy and the constitutional violation. *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Since the plaintiff concedes that Tunica County had a policy of initiating searches for disabled adults before the 24-hour waiting period, the plaintiff cannot meet all of the elements required for a § 1983 claim.

Accordingly, the court concludes that Tunica County's motion for summary judgment regarding the plaintiff's § 1983 claims should be granted on the merits.

## 2. Intentional Infliction of Emotional Distress

"Under Mississippi law, the standard for IIED 'is very high: a defendant's conduct must be 'wanton and wilful [such that] it would evoke outrage or revulsion.'" *Cheatham v. Allstate Ins.* Co., 465 F.3d 578, 586 (5th Cir. 2006) (quoting *Hatley v. Hilton Hotels Corp.*, 308 F.3d 473, 476 (5th Cir. 2002)). "To prove a claim of intentional infliction of emotional distress, a plaintiff must show that the defendant's conduct was extreme and outrageous, going beyond all possible bounds of decency." *Funderburk v. Johnson*, 935 So.2d 1084, 1100 (Miss. Ct. App. 2006). "Liability does not extend to 'mere insults, indignities, threats, annoyances, or petty oppression." *Id.*

The plaintiff alleges in her Complaint that Tunica County is liable for intentional infliction of emotional distress for two reasons. First, because the Sheriff's Department did not provide her with all of the information she requested. Second, because a Deputy called her to tell her that she could come visit the site where they found her mother, but when she arrived, an unknown female Deputy refused access and indicated that she should call her lawyer. In her response brief, the plaintiff concedes that under normal circumstances, neither of these instances would rise to the level of "outrage or revulsion." However, the plaintiff argues that these incidents were rendered "outrageous" given that Tunica County knew in the first instance that the plaintiff was looking for her missing mother, and in the second instance knew the plaintiff wanted to see the remains of her mother that had been located a year after her disappearance.

Tunica County argues that with regard to the allegation involving the requests for documents: (1) the documents in question were not "public" pursuant to Miss. Code Ann. § 45-29-1 since they were investigative documents and pursuant to the statute, the proper procedure for determining which documents were public and which were investigative was a private hearing before a judge

pursuant to Miss. Code Ann. § 25-61-13; (2) to allow this claim to stand would frustrate the intent of §§ 25-61-13 and -15 by allowing an alternative mechanism to penalize a governmental entity for a violation of Mississippi's public record laws and allow the fact finder to potentially return damages in excess of the state-law maximum of $100; (3) the documents in question were turned over without the necessity of additional litigation as admitted in the Complaint;[3] and (4) in any event, any delay in providing the plaintiff with the requested documents arose from investigative concerns and not from a malicious intent to inflict emotional distress upon the plaintiff.

Regarding the refusal by the unknown female deputy to allow the plaintiff to view the site of her mother's remains, Tunica County argues: (1) the plaintiff has conducted no formal discovery to ascertain the identity of this person and is therefore relying on mere allegations; and (2) the security of the scene where human remains are found is important and it is not outrageous for a Deputy to prevent access shortly after the remains were discovered; and (3) even if the plaintiff was initially told by another Deputy she could view the site, the refusal by another Deputy does not rise to the level of "outrage or revulsion."

The court concludes that even after viewing the facts in a light most favorable to her, the plaintiff has not submitted sufficient evidence to meet the high standard in demonstrating a genuine issue of material fact that Tunica County's actions rise to the level of "extreme and outrageous [conduct], going beyond all possible bounds of decency." *Funderburk*, 935 So.2d at 1100.

Regarding Tunica County's apparent refusal to turn over the voluminous documents

---

[3] "In response to Plaintiff's February 20, 2006 request, Tunica County sent Plaintiff approximately three hundred (300) pages of information. The majority of the information Tunica County provided Plaintiff did not conform to her previous requests and was duplicative in nature." Complaint at ¶¶ 68-69.

requested by the plaintiff cannot be said to have been extreme and outrageous beyond all bounds of decency given that (1) it is undisputed that much of the information requested were investigative in nature and the investigation into the disappearance of Norma Massa was still open, (2) the plaintiff failed to seek a judicial hearing to determine which documents were public which were protected as investigative pursuant to § 45-29-1 and § 25-61-13, (3) and Tunica County ultimately provided her with 300 pages of documents, even if those documents did not fully conform to the plaintiff's requests.

Regarding the refusal to allow the plaintiff to enter the scene where her mother's body was found, the plaintiff has not disputed that she has not conduct formal discovery on the identity of the unknown female deputy, and even if she had determined her identity, the refusal to allow access to an active crime scene by one Deputy after being told by another Deputy that she could have access is not extreme and outrageous conduct – especially since there is no evidence that the unknown female deputy had any knowledge that the plaintiff had been granted access by another Deputy.

## 3. Reckless Disregard

Pursuant to Section 11-46-9(1)(c):

A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim: ... Arising out of any act or omission of an employee of a governmental entity engaged in the performance or execution of duties or activities relating to police or fire protection *unless the employee acted in reckless disregard of the safety and well-being of any person no engaged in criminal activity at the time of the injury.*

Miss. Code Ann. § 11-46-9(1)(c) (emphasis added).

It is undisputed that Norma Mass was not engaged in criminal activity at the time of the injury. The plaintiff argues that Deputy Katie Johnson acted in reckless disregard for the safety of Ms. Massa by not initiating an immediate full-scale search on December 13, 2004 – including dogs

and helicopters with heat-sensing devices – when first told of Ms. Massa's disappearance, knowing that the temperature was in the 30s and that Ms. Massa was a disabled adult and had wandered away a few months before. The plaintiff argues that Deputy Johnson violated Tunica County's own policy requiring an immediate search for disabled adults by incorrectly stating that Tunica County's policy was to not conduct full-scale searches for adults during the first 24 hours.

Reckless disregard has been defined by the Mississippi Supreme Court as "a higher standard than gross negligence, and it embraces wilful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Phillips v. Mississippi Dep't of Public Safety*, 978 So.2d 656, ¶ 19 (Miss.2008). The court is to "look to the totality of the circumstances when considering whether someone acted in reckless disregard." *Id.* Furthermore, "the nature of the officer['s] actions is judged on an objective standard with all the factors that they were confronted with, taking into account the fact that the officers must make split-second decisions." *Id.* (citing *City of Jackson v. Powell*, 917 So.2d 59, 71 (Miss. 2005)). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 392 (1989).

Tunica County argues that not only did Deputy Johnson's actions not constitute reckless disregard, the statute of limitations has run on this claim. Mississippi Code Ann. § 11-46-11(3) provides a one-year statute of limitations period, plus 120 days, for suits filed under the Mississippi Tort Claims Act. Tunica County argues that since the reckless disregard claim in the Complaint confines itself to Deputy Johnson's failure to conduct a full-scale search on December 13, 2004 and instead waited until around 1:00 p.m. on the next day, the deadline by which to have filed a claim – including the additional 120 days – was April 12, 2006, whereas the Complaint was not filed until

May 4, 2006.

In response, the plaintiff argues that the discovery rule announced in *Barnes v. Singing River Hospital Systems*, 733 So.2d 199, 205 (Miss. 1999) tolled the statute of limitations period until her mother's remains were found on January 1, 2006. Tunica County argues that the Mississippi Supreme Court overruled the discovery rule announced in *Barnes* in *Caves v. Yarbrough*, — So.2d – 2007 WL 3197504 (Miss. November 1, 2007). The plaintiff counters that a mandate has not issued in *Caves* due to a pending motion for rehearing and that therefore the opinion is not final. Tunica County counters that the decision in *Caves* best illustrates the Court's orientation on the matter and that therefore this court's *Erie* guess should be guided by *Caves*.

This court agrees that the decision in *Caves* is instructive in its *Erie* guess. The Court in *Caves* held that "nothing within the language of the MTCA allows its one-year limitation for bringing a claim to be tolled until the accrual of a cause of action, or the plaintiff's 'discovery of the claim.'" *Caves* at 4. The Court concluded: "[W]e find that, because the Legislature has provided no discovery rule in the MTCA, we shall no longer create and supply one, as this Court previously did in *Barnes* [ *v. Singing River Hospital Systems*, 733 So.2d 199, 205 (Miss. 1999)]. We overrule *Barnes* and its progeny, and we affirm the trial court's grant of summary judgment and its finding that Mrs. Cave's claims was time-barred because she failed to commence her action within the MTCA's one-year statute of repose." *Id.* at 7.

Thus, even though a mandate has not yet been entered in the *Caves* case, the court concludes that the case illustrates the Mississippi Supreme Court's current position regarding a discovery rule for claims filed under the MTCA. Accordingly, the plaintiff's reckless disregard claim against Tunica County via Deputy Katie Johnson in her official capacity should be dismissed as barred by

the statute of limitations found in Miss. Code Ann. § 11-46-11(3).

## C. Plaintiff's Claims Against Barden Mississippi Gaming, LLC

The plaintiff alleges that Fitzgerald's Casino is liable for negligence, gross negligence, negligent supervision, and intentional infliction of emotional distress.

### 1. Negligence and Gross Negligence

In her Complaint, the plaintiff alleges that because Norma Massa was a "business invitee" of the casino, the casino "had an affirmative duty to come to her aid when they knew or should have known that she was in distress and was in need of medical assistance." Complaint at ¶ 86. The plaintiff alleges that the casino conducted video surveillance during the time at issue and therefore saw Ms. Massa leaving the casino at 12:26 p.m. on December 13, 2004, wandering around in the parking lot for approximately 20-25 minutes, and eventually walking toward the Tunica River Park Museum. The plaintiff argues that the video tape shows that a security vehicle approached Ms. Massa in the parking lot and that because of an 11-second glitch in the video, it is unclear whether the security official spoke with Ms. Massa. The plaintiff asks the court to assume that the security official did in fact speak with Ms. Massa and therefore was on notice that she was disoriented given the court-appointed expert's conclusion that the subject 11 seconds were missing from the tape – though the expert did not conclude that the tape had been deliberately tampered with.

The Complaint argues that "Fitzgerald's also violated the duty of care owed to Norma Massa by negligently failing to take reasonable, affirmative steps to render minimal, necessary assistance to avoid her wandering away from the casino in a confused and disoriented state."

By Order of December 12, 2007, the court allowed the plaintiff to amend her Complaint by adding a claim for gross negligence based on the alleged alteration of the subject video tape.

The casino argues that there is no evidence that Ms. Massa exhibited a need for medical attention when she left the casino at 12:26 p.m. on December 13, 2004. The casino maintains that the depositions of other residents of St. Peter Manor who accompanied Ms. Massa to the casino affirm that she exhibited no unusual behavior, that prior to leaving the casino, Ms. Massa had a conversation with two casino vendors who noted nothing unusual about her behavior, and that the plaintiff does not dispute that Ms. Massa was free to leave the casino at any time.

In response, the plaintiff argues that the casino "owed Norma Massa a duty to aid her and to prevent her from wandering to the nearby hazards and return her to her St. Peter's Manor group." Plaintiff's Response Brief at 3. She argues that the casino had this duty because the casino's marketing efforts included retirement homes and senior living facilities, the casino was on notice that the tour bus from St. Peter's was arriving at 11:00 a.m. on December 13, 2004, the casino knew that St. Peter's was a retirement home, the casino knew or should have known that as a retirement home, the St. Peter's group would consist of elderly patrons, the casino knew or should have known that many of these patrons would have medical or mental disabilities, the casino should have known that Norma Massa was in distress when she was wandering around in the rear parking lot in near-freezing weather, and the casino knew that on December 13, 2004 the Mississippi River had crested and flooded the woods in the immediate area around the casino.

The plaintiff argues that the affidavit of Ethel Donnelly is sufficient evidence to create a genuine issue of material fact of whether Ms. Massa was confused and did not seem to know where she was. The casino correctly points out that the affidavit, Exhibit 7 to the plaintiff's response to the casino's motion for summary judgment, is not notarized. Furthermore, the affidavit itself is less than a page of typed text, much of which is crossed out in pen with words substituted in pen for crossed-

out typed text. After considering the cross-outs, it seems the gist of the affidavit is that Ms. Donnelly believed Ms. Massa should have been in a nursing home. In any event, the court concludes that the evidence is inadmissible, given its lack of clarity and lack of an indication it was a sworn affidavit.

Thus, the only evidence that the plaintiff offers to establish that the casino had knowledge that Ms. Massa was disabled and in duress after she left the casino of her own accord on December 13, 2004 is the video surveillance. The court observes that the plaintiff appears to argue that the evidentiary value of the video surveillance is three-fold: first, since the security cameras were filming Ms. Massa walking around in the parking lot for approximately thirty minutes, the implication is that there must have been casino employees observing the surveillance video and yet did nothing to aid Ms. Massa; second, the fact there is an 11-second glitch in the video which occurred during the period in which the casino security vehicle stopped near Ms. Mass, means that an adverse inference should be drawn in favor of the plaintiff such that the court should instruct the jury that they should presume that the security guard (John Russell) did in fact speak with Ms. Massa, and presumably had knowledge she was in duress, and yet did nothing to aid her; and third, Ms. Massa was passed by the casino's shuttle bus on three separate occasions and the driver had the duty "to assume certain security officer duties, to be proactive in his observations and, particularly, to be on the look-out for suspicious or unusual persons or things or anything out of the ordinary." Plaintiff's Response Brief to Fitzgerald's Motion for Summary Judgment at 5. With further regard to the security guard, John Russell, the plaintiff argues that he lied to the plaintiff's private investigator by initially denying that he was the driver of the security vehicle in question. Therefore, the plaintiff argues, Mr. Russell's credibility is in question.

Later in her Response Brief, the plaintiff argues that the casino cannot deny that Ms. Massa

suffered from dementia at the time of her disappearance and that she was found in the woods a few miles away from the casino. She argues that "it is a reasonable inference from these two facts that Ms. Massa became confused or disoriented and wandered from the casino to her demise. There is no credible evidence to indicate otherwise." Response Brief at 7. However, the plaintiff does not mention that two people, including the plaintiff, believe that Ms. Massa left a voice-mail message to her daughter a few days after Ms. Massa left the casino on December 13, 2004. Furthermore, it is undisputed that the search dogs indicated that Ms. Massa had gone to other casinos and possibly to the Oak Court Mall in Memphis, Tennessee some forty miles away from the casino. Thus, the plaintiff is incorrect that there is no credible evidence to rebut the inference that the alleged fact that Ms. Massa suffered from dementia when she left Fitzgerald's on December 13, 2004 and the fact she was found in the woods two miles away from Fitzgerald's approximately a year later.

After considering the plaintiff's evidence and arguments in a light most favorable to her, the court concludes that she cannot create a genuine issue of material fact that Fitzgerald's (a) had knowledge that Ms. Massa was suffering from dementia and was in distress when she voluntarily left the casino on December 13, 2004; and (b) had a special duty to care for and provide special protection to Ms. Massa because she was a disabled resident of an assisted-living institution. Therefore, the plaintiff's negligence and gross negligence claims fail as a matter of law for failure to meet the duty and breach requirements for negligence.

As stated above, the affidavit of Ms. Donnelly is inadmissible for lack of evidence the statements were made under oath and for lack of clarity in the statement. The plaintiff has cited no authority for the proposition that casinos take upon themselves a special duty to care for and protect residents of assisted-living homes, especially a woman who was free to come to and go from the

casino at any time and was not under the special supervision of St. Peter Manor. The plaintiff has no evidence other than conclusory allegations that anyone watched Ms. Massa on the surveillance tape while she walked in the parking and/or that a person who might have watched had knowledge that Ms. Massa was in distress. Although there was an 11-second glitch in the surveillance footage, there is no evidence that the security guard in question had knowledge that Ms. Massa was in distress and needed assistance. Despite the plaintiff's argument that the security guard's credibility is in question, that alone is not sufficient to create a genuine issue of material fact as to negligence or gross negligence. Evidence relied on to create such an issue must be substantial. *Southern Distributing Co.*, 574 F.2d at 826 (5th Cir. 1978).

## 2. Negligent Supervision

In her Complaint, the plaintiff alleges that Fitzgerald's negligently supervised and trained its employees by failing to train its employees to recognize and provide special protection to elderly patrons. The plaintiff argues that Fitzgerald's brought about the duty to do so because they heavily market to retirement homes. The Complaint states: "Fitzgerald's 'Guest Safety' or surveillance personnel or any of its numerous employees failed to come to the aid of Norma Massa because they had been negligently trained and supervised and failed to recognize the obvious medical conditions and distresses Norma Massa was enduring on December 13, 2004." Complaint at ¶ 105.

As discussed above regarding the plaintiff's negligence and gross negligence claims, the court concludes that even after viewing the facts in a light most favorable to her, the plaintiff has failed to create a genuine issue of material fact warranting a trial on her negligent supervision claim. The plaintiff cites no authority for the proposition that a casino owes a special duty to train their employees to care for (and recognize medical ailments of) patrons who live in assisted-living

arrangements – especially when that person is free to leave the casino at any time and is not accompanied by any health-care providers or other persons charged with caring for or protecting the person. Nor does has the plaintiff offered sufficient evidence that any casino employee had knowledge that Ms. Massa was suffering from "obvious medical conditions and distresses."

### 3. Intentional Infliction of Emotional Distress

The Complaint alleges that "Fitzgerald's breached their duty to Plaintiff by knowingly, intentionally, and recklessly obstructing and impeding Plaintiff's efforts to discover the whereabouts of her mother, Norma Massa." Complaint at ¶ 109. Furthermore, "Fitzgerald's intentional, knowing, and reckless obstruction of the investigation of Norma Massa's disappearance is so outrageous in character and so extreme in degree to go beyond all possible bounds of civilized decency." Complaint at ¶ 113.

In their motion for summary judgment, the casino argues that the one-year statute of limitations period for the intentional tort of intentional infliction of emotional distress bars the plaintiff's claim in this instance because the plaintiff cannot show that she had any contact with a Fitzgerald's employee after March 2005 and she did not file her lawsuit until May 4, 2006.

In response the plaintiff argues that the claim is based on the 11-second glitch in the surveillance tape which the plaintiff alleges was intentional. She argues that she did not discover it until September 2007, and therefore the statute of limitation period has not run.

The plaintiff alleged intentional infliction of emotional distress in her Complaint, which was filed on May 4, 2006, not in September of 2007. The court presumes from this discrepancy that the plaintiff does not dispute that she had no contact with Fitzgerald's employees after March 2005. Therefore, any claim based on pre-March 2005 conduct is time-barred.

However, the casino admits that the earliest the plaintiff had access to the subject tape was when they voluntarily produced it to her on September 15, 2005 - seven-and-a-half months before she filed suit on May 4, 2006. Accordingly, after viewing the facts in a light most favorable to the plaintiff, the court concludes that the one-year statute of limitations period did not run on her intentional infliction of emotional distress insofar as it is based upon the alleged alteration of the tape.

Nevertheless, the intentional infliction of emotional distress claim based upon the subject surveillance case is severely flawed. The court-appointed expert did not conclude that the subject tapes had been intentionally altered. Rather, in Robert H. Schmedlen's September 17, 2008 report to the court, he concluded: "I discovered nothing to specifically indicate that these video surveillance tapes had been intentionally or purposely corrupted." In her Response Brief, the plaintiff points to no other evidence indicating that the subject tape was intentionally altered. Accordingly, she cannot create a genuine issue of material fact for her intentional infliction of emotional distress claim based upon the allegedly deliberate alteration of the subject tape.

### III. CONCLUSION

For the reasons discussed above, the court concludes that Defendants Tunica County, Mississippi and Tunica County Sheriff's Department's Motion for Summary Judgment [445] should and Defendant Barden Mississippi Gaming, LLC's Motion for Summary Judgment [453] should be granted; whereas, the plaintiff's Motion for Partial Summary Judgment [455] should be denied. Thus, all of the plaintiff's claims against all defendants should be dismissed with prejudice for failure to demonstrate a genuine issue of material fact warranting trial. Accordingly, a Final Judgment shall issue forthwith,

**THIS DAY** of August 20, 2008.

/s/ W. Allen Pepper, Jr.

W. ALLEN PEPPER, JR.
UNITED STATES DISTRICT JUDGE